UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED SATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | No. 05 CR 0223 |
| ) | |
| v. ) | Judge John W. Darrah |
| ) | |
| ISRAIL VENGERIN, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

On June 2, 2005, a grand jury returned a seven-count superceding indictment against Israil Vengerin and Vladimir Melster. Count One charges that Vengerin conspired with others and threatened the use of violence to cause harm to Individual A to collect or to attempt to collect from Individual A an extension of credit arising from a debt in violation of 18 U.S.C. § 894. Count Two charges that Vengerin knowingly participated in the use of extortionate means to collect and to attempt to collect extensions of credit from Individual A in violation of 18 U.S.C. § 894(a) and 2. Count Three charges Vengerin knowingly attempted to commit extortion obtained as "street tax" or "protection money" from a business in violation of 18 U.S.C. § 1951. Counts Four, Five, and Six charge that Vengerin and Melster participated in a scheme to defraud certain insurance companies in violation of 18 U.S.C. § 1341. Count Seven charges that Vengerin knowingly participated in the use of extortionate means to collect and to attempt to collect extensions of credit from Melster that arose from a debt that Vengerin claimed arose as a result of a falsely staged burglary in violation of 18 U.S.C. § 894(a) and 2. Presently pending before the Court is Defendant Vengerin's Motion to Dismiss Indictment on Grounds of Improper Joinder of Offenses under Rule 8 of the Federal Rules of Criminal Procedure.

## BACKGROUND

A reading of the Superceding Indictment supports the following summary of the alleged conduct of the parties.

In the early part of 1999, Vengerin and Melster met and discussed the possibility of staging a burglary at Designer Paint and Wallpaper, a business owned by Melster, so that Melster could file a false insurance claim. Vengerin and Melster agreed that they would split the proceeds paid by the insurance company for this false claim.

Vengerin contacted Individuals G, H, and I to help with the staged burglary. Melster agreed to pay Vengerin and Individual G $4,000 prior to the staged burglary as an advance on the insurance proceeds. Melster, Vengerin, and Individuals G, H, and I engaged in a series of telephone conversations regarding the planning of the staged burglary.

On August 30, 1999, Individuals G, H, and I broke into Designer Paint, stole merchandise, and took the merchandise to a Deerfield, Illinois, residence. On August 31, 1999, Melster filed a police report regarding the burglary with the Skokie Police Department.

On December 10, 1999, Melster mailed his insurance company a false document, a signed Sworn Statement of Loss for $273,000, related to the staged burglary. On January 4, 2000, the insurance company's counsel mailed a letter to Melster requiring that he appear for an examination under oath and produce original documents in support of his insurance claim. In furtherance of the scheme to defraud the insurance company, Melster and Vengerin rescheduled multiple attempts to take Melster's examination under oath through the use of the telephone and the mail.

On January 24, 2000, Vengerin called Individual C to arrange a meeting for later that evening to discuss collection of an outstanding debt. Later that evening, Individual B and Individual C met

with Vengerin and Individual D in a parking lot in order to hire Vengerin to collect an outstanding debt that Individual A owed to Individuals B and C. During the meeting, Vengerin told Individuals B and C that he would keep 50 percent of the amount that he collected from Individual A.

On March 8, 2000, Viktor Khilchenko, Nazar Babiychuk, and Anatoliy Denegin confronted Individual A in his car. Khilchenko told Individual A that he owed Individual B $80,000 and threatened Individual A several times, telling him that his head was worth much less than the money he owed. Khilchenko, Babiychuk, and Denegin further threatened Individual A to compel him to pay the money they demanded by telling Individual A they would put him in the hospital. Khilchenko instructed Individual A to call Individual B and to meet with Individual B the following day to determine precisely how much money was owed. Khilchenko advised Individual A that they would find him after he called Individual B.

On March 9, 2000, Khilchenko, Babiychuk, and Denegin drove to a restaurant to attend the meeting between Individuals A and B. Before Individual B arrived, Khilchenko demanded money from Individual A and asked him if he was wearing a wire. At the conclusion of the meeting between Individuals A and B, Khilchenko, Babiychuk, and Denegin advised Individual A that they would harm Individual A, his girlfriend, and his family if he did not pay the money they demanded. Individual A was directed to bring $20,000 to a location by 3:00 p.m. the next day. When Individual A protested that he could not raise that amount of money by 3:00 p.m., Khilchenko changed the time to 5:00 p.m.

On March 10, 2000, Individual E and Denegin met with Individual A at the designated meeting place. When Individual A advised them that he only brought $5,000, Individual E advised Individual A that he was supposed to bring $20,000. Denegin directed Individual A to give the

$5,000 to Individual E and agreed to meet Individual A the next morning for the remaining funds. Later, Vengerin met with Babiychuk. After that meeting, Vengerin told Individual D that he had given the debt collection job for Individuals B and C to "the guys from the Ukranian Village" and gave Individual D $200 of the $5,000 Individual A had earlier given to Individual E.

On March 11, 2000, Khilchenko, Babiychuk, and Individual E met with Individual A to collect the balance of the money. When Individual A asked for guarantees for his family's safety upon payment of the money, Individual E told Individual A not to be stupid and not to contact the police. Khilchenko told Individual A that no one would touch his family or girlfriend if he paid the money they demanded. Individual A gave Individual E $10,000; and Khilchenko and Babiychuk told Individual A to bring them an additional $25,000 by March 26, 2000. Between March 10 and 11, 2000, Vengerin received approximately $900 of the $5,000 Individual A had given to Individual E on March 10, 2000. Khilchenko received approximately $500 of the $5,000 Individual A had given Individual E on March 10, 2000.

In furtherance of the conspiracy, Individual B falsely denied ever approaching anyone to collect the money from Individual A owed to Individuals B and C when interviewed by agents with the FBI.

From June 28, 2004, through at least October 6, 2004, Vengerin made express and implicit threats of use of violence to cause harm to Melster to collect or attempt to collect from Melster an extension of credit arising from a debt Vengerin claimed arose as a result of the staged burglary of Designer Paint.

## ANALYSIS

Defendant argues that Counts Four through Six are improperly joined with the other counts because they are not related to the other counts and would cause confusion and extreme prejudice if tried together.

Joinder of offenses is allowed if the offenses "are of the same or similar character, or are based on the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). There is a strong policy preference in favor of joinder motivated by judicial efficiency. Accordingly, offenses are compared for categorical, not evidentiary, similarities. *See United States v. Jackson*, 208 F.3d 633, 638 (7th Cir. 2000).

Here, Counts One through Three charge Vengerin with the collection of debts through extortionate means based on the activities described above during April 24, 2000, through at least March 11, 2000. Counts Four through Six charge Vengerin with a mail fraud scheme to defraud an insurance company along with Co-Defendant Melster. Count Seven charges Vengerin with the collection of debts through extortionate means based on Vengerin's activities attempting to collect a debt from Melster relating to the mail fraud scheme in Counts Four through Six.

Counts One through Three and Seven allege the collection of debts by extortionate means; accordingly, these counts are properly joined. *See United States v. Jamal*, 87 F.3d 913, 914 (7th Cir. 1996) (joinder of identical charges is proper). Furthermore, while Counts Four through Six charge a different crime, mail fraud, the counts are connected to Count Seven. The alleged attempt to collect the debt found in Count Seven is based on funds Vengerin believed were owed from the mail fraud scheme that are the basis of Counts Four through Six.

5

## CONCLUSION

For the reasons stated above, Defendant Vengerin's Motion to Dismiss Indictment on Grounds of Improper Joinder of Offenses under Rule 8 of the Federal Rules of Criminal Procedure is denied.

Dated: December 16, 2005

JOHN W. DARRAH
United States District Judge